**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CASE. NO. 19-CR-416 (EGS)** |
| | : | |
| | : | |
| **DYLAN YOUNG,** | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR IMMEDIATE RELEASE FROM CUSTODY**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defense's bond review motion, styled as an Emergency Motion for Immediate Release from Custody. The defense's motion is based entirely on COVID-19, and does not even attempt to engage with the detention factors pursuant to 18 U.S.C. 3142, attempt to refute the dangerousness of Mr. Young, nor explain how release to home confinement (even if practicable) would serve to mitigate this danger. That is because he cannot.

The Defendant is charged with (and has agreed to plead guilty to) Distribution of Child Pornography in violation of 18 U.S.C. Section 2252(a)(2), a violent offense with a five year mandatory minimum sentence. Moreover, his actions in this case, which involve distributing hundreds of videos of child pornography featuring children as young as toddlers being sexually abused and gleefully discussing the sexual exploitation of children, plainly display the high level of danger he presents to the community. The defense presents no realistic plan for Mr. Young's proposed release (including how it would be safely effectuated given that his residence is in Washington State), nor could they explain how that plan would mitigate the high-level of danger due to the specific nature of these crimes.

1

The unlawful conduct here is internet-based and was apparently committed while the Defendant was in his home in the first place. As pre-trial has stated in this and other cases, even within D.C., they cannot effectively monitor and ensure compliance with a "no internet-capable electronic devices" condition, due to the ubiquity of internet capable devices, ease of access, and pre-trial's own resource constraints.  As a result, home confinement would do little if anything to ensure the safety of the community from Mr. Young's re-offending, and this might be the rare case where COVID-19 might actually enhance the Defendant's dangerousness by providing him more opportunity to connect to other similar individuals and to children who are now at home.

In support of this motion, the government submits as follows.

## **PROCEDURAL HISTORY**

On May 8, 2019, the Defendant was arrested in his home state of Washington on an arrest warrant issued out of this Court in connection with a Criminal Complaint charging the defendant with Distribution of Child Pornography in violation of 18 U.S.C. § 2252(a)(2) and Conspiracy to Distribute and Receive Child Pornography in violation of 18 U.S.C. §§ 2252(a)(2) & (b)(1). He was ultimately transferred from the Eastern District of Washington to this Court, and made his initial appearance before this court on June 5, 2019. On June 10, 2019, the Defendant waived his preliminary hearing and conceded detention without prejudice pursuant to 18 U.S.C. § 3142(e). On December 19, 2019, the Defendant made a motion for temporary release to attend a funeral. The Court denied that motion after hearing on December, 23, 2019, inter alia based on concerns regarding dangerousness and/or risk of flight.

Beginning in June 2019, the parties engaged in discovery and substantial plea negotiations. The  parties ultimately reached a plea agreement for the Defendant to plead guilty to  one count of

Distribution of Child Pornography in violation of 18 U.S.C. § 2252(a)(2), an offense with a mandatory minimum sentence of five years' incarceration. The parties have signed plea paperwork, provided a copy of that paperwork to your Honor (which was updated to respond to the Court's concerns), and were prepared to formally enter the plea on March 16, 2020. However, due to COVID-19, that plea hearing did not occur and has been rescheduled until June 2020.

On April 7, 2020, the Defendant filed a motion for immediate release into home confinement, citing the outbreak of COVID-19 in the Washington, D.C. area as the basis.

## ARGUMENT

A defendant must be detained pending trial if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A court may reconsider its decision regarding pretrial detention at any time before trial if "information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f).

Because Distribution of Child Pornography is a violent crime (and a crime involving a minor victim), there is a rebuttable presumption under 18 U.S.C. § § 3142(e)(2) & (3)(E) that the defendant constitutes a danger to the community, and that no pretrial release condition or combination of conditions may be imposed to assure the safety of any other person and the community.[1] This presumption "operate[s] at a minimum to impose a burden of production on

[1] Section 18 U.S.C. 3156 defines a "crime of violence" to include a violation of Chapter 110, under which violations of 18 U.S.C. § 2252(a)(2) fall.

3

the defendant to offer some credible evidence contrary to the statutory presumption." United States v. Alatishe, 768 F.2d 364, 371 (D.C. Cir. 1985)

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g).

Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the § 3142(g) factors. See United States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." United States v. Stone, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

The Defendant's motion does not attempt to address this applicable standard nor truly engage with the 3142(g) factors, instead focusing solely on the danger presented by COVID-19. While COVID-19 is undoubtedly a very serious global pandemic, the Defendant merely states (without providing any specific information, evidence, or documentation) that he has a medical

4

condition that places him at particular risk, and does not address how this negates the dangerousness he presents, especially where his offense is both a mandatory minimum violent offense, and electronically based.

In this case, even in light of the outbreak of COVID-19 in the Washington, D.C. area, there are no condition or combination of conditions that will reasonably assure the safety of the community if the defendant is released.

## I.      The Bail Reform Act factors are in favor of detention.

An analysis of the Bail Reform Act factors shows that the defendant cannot rebut the presumption that he shall remain detained, as there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community--especially given the internet-based nature of the Defendant's offense conduct.

## A.  <u>The Nature and Circumstances of the Offense Charged</u>

First, the nature and circumstances of the offense are egregious. The Defendant was charged with and agreed to plead guilty to Distribution of Child Pornography, a crime of violence against a child that carries a mandatory minimum sentence of five (5) years of incarceration.   The seriousness of this offense, however, goes beyond this definition as a violent crime and the stringent punishment imposed.  As one Court put it:

> we have numerous victims in a case like this, not one victim. Every image of a child, every image of a nonadult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of people—children who are forced into these roles.

> <u>United States v. Miller</u>, 665 F.3d 114, 121-22 (5th Cir. 2011) (internal quotations omitted).

Moreover, the Defendant's actions in this case go beyond the standard distribution of child pornography. As discussed in detail in the Government's prior filings (including the complaint at ECF 1), he sent links to hundreds and hundreds of videos of child pornography, he sent some of the most disturbing child pornography possible, including videos depicting children as young as toddlers being sexually abused and penetrated. And, he did not engage in this activity passively or in one instance. Rather, he actively sent it on multiple occasions, actively encouraged others to share child pornography, and gleefully commented on and discussed the sexual exploitation of children.  This factor strongly favors detention.

**B.   The Weight of the Evidence Against the Defendant**

The evidence against the defendant is overwhelming, including irrefutable electronic evidence from the KiK communications and the Defendant's own cell phone as well as the Defendant's own admissions through the guilty plea and statement of offense that he has agreed to enter into. This factor weighs in favor of detention.

**C.   The History and Characteristics of the Defendant**

As the Court is well aware, Defendants in these types of cases often possess positive characteristics that allow them to remain undetected in society. Quite often, these defendants in appear to be like any other law-abiding citizen, with education, work histories, and supportive families. The danger they pose to children is often not readily apparent. The defendant appears to fit this mold, atleast to some extent, as he has no prior criminal history.

However, his actions in this case, which involve possessing and sending large quantities of the most egregious child pornography on multiple occasions, together with the inherently

difficult to detect-electronic nature of the offense,[2] suggest that he may have been engaged in this type of criminal conduct for some period of time prior to arrest. Therefore, his lack of criminal history may not accurately reflect his history and characteristics.

### D.  The Nature and Seriousness of the Danger to Any Person or the Community

Finally, the fourth factor, the nature and seriousness of any danger to the community, strongly favors detention. It bears repeating that the Defendant has been charged with and agreed to plead guilty to a violent offense that carries a mandatory minimum sentence of 5 years. In this case, the Defendant distributed large quantities of child pornography featuring children as young as toddlers being sexually abused on multiple occasions and he gleefully discussed the sexual exploitation of children with others he believed to be pedofiles.

Due to the specific nature of these crimes, the defense does not, nor could they explain how release in home confinement would mitigate the high-level of danger (even assuming that such a measure could be safely effectuated at this time where the Defendant lives in Washington State). While COVID-19 could, in some cases, alter the calculus of a defendant's dangerousness--for example a drug dealer or armed robber might be less able to engage in their actions during quarantine and thus present less of a risk of recidivism--that is not so here.   The unlawful conduct here is electronically-based and was apparently committed while the Defendant was at his home in Washington State in the first place. Moreover, as pre-trial has stated in other cases, they cannot

---

[2] As the Court is well-aware, the application that the Defendant used, KiK Messenger, is equipped with several features to allow users to avoid detection including "anonymous" browsing, private invitation only chatrooms, and automatic file deletion if someone attempts to access the account from a different device.

effectively monitor and ensure compliance with a "no internet-capable electronic devices" condition, due to the ubiquity of internet capable devices, ease of access, and pre-trial's own resource constraints. As a result, a release to home confinement would do little if anything to ensure the safety of the community from Mr. Young's dangerousness.

The Defendant did not attempt to fully engage with the detention factors pursuant to 18 U.S.C. 3142(g), nor attempt to refute his dangerousness. An analysis of these factors demonstrates that the Defendant cannot rebut the presumption that he presents a danger to the community, as a result, the Defendant should remain detained pending sentencing.[3]

## II.   While the COVID-19 pandemic is dangerous, it is not a changed circumstance that warrants reconsideration of bond in this particular case.

COVID-19 is a dangerous global pandemic that continues to grow rapidly and clearly presents serious and evolving risks.  However, it should not now be viewed as a changed circumstance sufficient in every case to lead to the wholesale release of all defendants, including all violent offenders such as Mr. Young, who may possess a health condition. The defense claims that the Defendant possesses a health condition that places him at increased risk of adverse consequences of COVID-19, but it presents no evidence or documentation of this condition nor statistics detailing the increased risk. Indeed, he does not even identify the purported health condition, making it nearly impossible for the Government to fully address it. According to the  June 6, 2019 Pretrial Services Report (ECF 13), the Defendant is only 34 years old, reported no physical health

---

[3] It should also be noted that the Defendant also does not present a detailed plan for the Defendant's release or indicate how it believes that such a plan (which would presumably involve the Defendant traveling to Washington State) could be effectuated.

conditions nor any medications, reported no mental health concerns, reported no substance abuse nor problems with alcohol, and tested negative.

However, even assuming arguendo that the Defendant has a health condition, in this particular case, where the Defendant represents a substantial danger that would not be sufficiently mitigated by home confinement under the facts of this case, it is not a sufficient changed circumstance.

The government is aware that 3142(e) allows for reconsideration of bond determinations under changed circumstances, and that Court could read 3142(i)(4) to allow release temporarily to the custody of another if it finds a "compelling reason" that necessitates temporary release. However, given the danger presented by the Defendant, COVID-19 presents no such reason or circumstance. Moreover, according to the D.C. Department of Corrections (DOC), DOC appears to be have undertaken several steps to try to prevent the spread of COVID-19 within its facilities.

The United States Attorney's Office has been in consultation with the D.C. Department of Corrections (DOC) to obtain relevant information as to its handling of the public health crisis, and the office continues to get daily updates.  Based upon the information provided to the government at present, it appears that DOC is handling the situation reasonably under the circumstances – no different than any organization in the United States that is trying to weather this pandemic. Unless and until that changes, the government cannot endorse wholesale release of dangerous defendants.[4]

_____

[4] The government is aware of reports from local unions and the Fraternal Order of Police that DOC is derelict of its duties to its employees. *See* March 29, 2020 Press Release from Fraternal Order of Police Department of Corrections Labor Committee (describing DOC's failures to follow CDC guidance). On March 30, 2020, the ALCU and D.C. Public Defender Service sued DOC for what it claims are violations of the Fifth and Eighth Amendments. That case is assigned to Judge Colleen Kollar-Kotelly and is ongoing as referenced *infra*. While the government shares the concerns of others, we have been unable to independently verify these claims, which are contested. We will continue to update the Court of all information – positive or negative – as the information is made available to the U.S. Attorney's Office.

Specifically, as of March 27, 2020, according to DOC, DOC has done the following to ensure the safety of its incarcerated population:

- banned all non-attorney visits to limit unnecessary exposure;

- implemented screening processes for all visitors and incoming inmates, including attorneys and staff; such screening includes assessing visitors and inmates for symptoms, sanitizing stations, etc.;

- if incoming residents at a DOC facility fail the screening process, they are given a mask and taken to medical to determine if they require further hospitalization or testing. Moreover, if there is concern that an inmate has COVID-19, the inmate will be placed into a single cell in a specialized unit, where the inmates only contacts are with medical staff, who will obtain COVID-19 testing within 3-4 days;

- DOC has implemented an incident command program, where each day, DOC units meet to discuss ongoing processes to combat the virus;

- DOC sends out daily reminders to its staff about taking preventative, prophylactic measures to avoid infection, such as washing hands, using sanitizer, etc.;

- DOC has constant meetings with the D.C. Department of Health to ensure its procedures meet both local and national standards, to include following updated recommendations of the Centers for Disease Control;

- DOC has continued to engage with the USAO and the local Public Defender Service to ensure continuity of operations;

- DOC checks and rechecks its ventilation system to ensure the air quality in the facilities;

- DOC is tracking and ordering additional cleaning and sanitation kits (for example, as of March 17, 2020, the D.C. jail had 55,200 bars of fresh soap, which it dispenses weekly to each inmate), as well as protective gear and it has mandated cleaning at its facilities every two hours;

- DOC would like to limit the number of inmates coming into its facility at any given time[5]; and

---

[5] Law enforcement partners have put in place procedures to reduce the number of individuals subject to custodial arrest, exercising their authority to issue citations for individuals to appear on a future dates. *See e.g.*, Metropolitan Police Department Order EO-20-011, *Coronavirus 2019 Modification to Citation Release Criteria* (effective March 17, 2020) ("[T]he USAO and OAG

- upon information and belief, DOC has the capacity to quarantine near 100 inmates, although that number is fluid and subject to change.

*See also* Coronavirus Prevention, D.C. Department of Corrections (March 27, 2020), https://perma.cc/L59Z-WG43 (explaining how DOC has suspended in-person visitations, enhanced cleaning efforts, ordered additional sanitation supplies, and diminished out-of-cell recreational time in response to the threat of COVID-19).

On April 1, 2020, DOC responded in a civil case regarding DOC's procedures, *Banks v. Booth,* 20-cv-849 (CKK), and provided additional information for the Court to consider, including all relevant written procedures and practices concerning COVID-19, particularly related to legal visits and communication. 20-cv-849, ECF No. 19. On April 3, 2020, DOC filed its opposition to

---

have exercised their authority under DC Code § 23-584(c) to categorically approve the citation release of arrestees consistent with the following updated criteria during the COVID-19 emergency. . .”). Additionally, on March 27, 2020, with the consent of the U.S. Attorney's Office and others, the Chief Judge issued an order regarding the suspension of the execution of bench warrants in certain misdemeanor cases and an order suspending all sentencing provisions requiring service of sentence on weekends.

Additionally, the inmate populations at CDF and CTF appear to be well below the figures prior to the outbreak of the pandemic. According to a report issued by the Office of the District of Columbia Auditor on Feb. 28, 2019, which was attached as an exhibit to PDS's motion for a Temporary Restraining Order filed in *Banks v. Booth,* Case 1:20-cv-00849-CKK (D.D.C. Mar. 30, 2020), as of June 2018, the average daily populations at CDF and CTF were 1346 and 692, respectively. According to the DOC census distributed to the Criminal Justice Coordinating Council (CJCC), the inmate populations as of February 29, 2020 (prior to the crisis) were 1242 at CDF and 540 at CTF, and on April 3, 2020 (following three weeks of measures in response to the crisis) were 1097 at CDF and 448 at CTF. In other words, the current jail populations at CDF and CTF are down approximately 18% and 35%, respectively, since the June 2018 average, and down approximately 11% and 17%, respectively, since the end of the month prior to the crisis.

As of April 7, 2020, that number has decreased further, by appropriate fifty inmates.

the plaintiff's application for a temporary restraining order.[6] *See Banks v. Booth*, 20-cr-849-CKK, ECF No. 25.  In addition, the government directs the Court to additional documents filed in that active litigation, including: ECF No. 20-1 (Declaration of Lennard Johnson); ECF No. 20-2 (Declaration of Beth Jordan); ECF No. 25 (Defendants' Opposition to Plaintiffs' Application for a Temporary Restraining Order); and ECF No. 25-2 (List of DOC Supplies).

While the government shares the defendant's concerns over the potential risk to the prison population, it remains unclear to undersigned counsel how the Defendant's release and transport to Washington State even would be safely effectuated and what, if any, precautions this defendant would be able to put in place to protect himself and those around him from COVID-19 if he were to be released. *See United States v. Edwards*, 20-mj-50, at *6 (RMM) (March 30, 2020 D.D.C.) ("Although [the defendant's] alleged health problems may make him at heightened risk if he contracts the coronavirus, he would be at risk even if he were not incarcerated."); *United States v. Washington*, 18-cr-309 (DLF) (D.D.C. Telephonic Conference April 2, 2020) (noting that an asthmatic defendant who is addicted to narcotics and avoided taking his mental health medication may be safer in custody).

As of today, April 11, 2020, the government learned that the total number of positive persons is 52 and all have been placed in quarantine.[7] All positive inmates are localized to CTF (one inmate was taken to a local hospital for observation) and are being monitored pursuant to

---

[6] Based on this opposition, there is clearly a material dispute of fact and law.

[7] This number is likely to change as more tests are conducted. For reference, as of April 7, 2020, there are 1078 residents at DOC's Central Detention Facility, 418 residents at DOC's Correctional Treatment Facility and 22 residents in halfway houses.

CDC guidelines. Of that group, 9 have fully recovered. As this Court is likely well aware, the possibility of COVID-19 – a global pandemic – reaching DOC was always a realistic possibility. But based on the information from DOC, DOC appears to be taking this pandemic seriously, and complying with D.C. Dept. of Health mandates regarding how to handle positive tests and symptomatic patients.   It is now incumbent on the government and the Court to balance the security and safety of the community with the safety of the defendant. Here, the defendant claims that the existence of COVID-19 necessitates wholesale release. That simply cannot be.

As defendants continue to ask for release based on COVID-19, courts in this district have begun to assess the validity of the various claims related to COVID-19 or the DOC. For example, in *United States v. Hill*, 19-cr-260 (APM) (D.D.C. March 19, 2020), the defendant filed a motion for release. The Court denied the defendant's motion for release in a bank robbery case, without a hearing, noting:

> Defendant's release would present a danger to the community and that there is no condition or combination of conditions that would reasonably assure the community's safety. Although the court recognizes the danger presented by the coronavirus outbreak, and that older populations are more vulnerable, on balance release is not warranted at this time. The Department of Corrections is taking precautions to protect the inmate population, and there is not any reported case within the inmate population (to the court's knowledge). The court is prepared to reconsider this order should conditions change at the jail.

*Id.,* Minute Order, March 19, 2020; *But see United States v. Meekins*, 18-cr-222 (APM) (D.D.C. March 31, 2020) (finding that the balance of favors weighs in favor of release). In *United States v. Smith*, 19-cr-324 (BAH) (D.D.C. March 23, 2020), the Court – the same Court that issued Standing Order 20-9 that suspended most courthouse operations as a result of the pandemic – remarked that "[t]he risk presented by the pandemic is serious, and the Court acknowledges that risk may be greater in a jail environment . . . ." But the Court also noted that:

> [T]he D.C. Department of Corrections has taken aggressive precautions to prevent the spread of the virus within the facility where defendant is detained . . . including suspending all in-person visits, programming, and volunteer activities within its facilities, enhanced cleaning efforts, especially within common areas, and vigilant medical personnel on alert for symptoms and prepared to isolate and treat symptomatic residents, *see* Department of Corrections Notice, Updated: March 14, 2020, available at https://doc.dc.gov/page/coronavirus-prevention. Although defendant is in an age group that may be more susceptible to the virus . . . this risk pertains whether the defendant were released or detained, and any heightened risk posed by pretrial detention does not outweigh the presumption in favor of detaining the defendant pretrial, nor does it alter the balance of the statutory factors Congress prescribed for determining the propriety of detention, which all continue to weigh heavily in favor of detention.

*Id.* (denying release in a child porn case). There is no reason to suggest that in the past two weeks, despite the existence of positive tests, that DOC has abandoned its protocol and seeks to endanger its inmates. *See, e.g.*, *Lee*, 19-cr-298, at * 11 (noting the "aggressive precautions that DOC appears to have undertaken to prevent the spread of COVID-19 within its facilities"); *United States v. Adams*, 19-cr-257-003, at *3-4 (DKC) (D. Md March 25, 2020) (COVID-19 is not the "kind of extraordinary reason for Mr. Adams' release. The correctional and medical staff at detention facilities continue to provide appropriate safeguards for health and safety of those committed to their custody."); *United States v. Parker II*, 18-cr-344, at *4, 8 (TDC) (D. Md March 21, 2020) (discussing Deputy U.S. Marshal who tested positive for COVID-19, crediting the defendant's alleged health risks [prior aneurysm, prostate cancer, and present diabetes], and noted that the D.C. Department of Corrections "has implemented prophylactic and other measures in response to the COVID-19 virus.").

While several district courts have already opined on the COVID-19 pandemic, it is clear that the analysis ultimately turns on the defendant's particular danger, even in cases involving vulnerable health conditions. *See, e.g.*, *United States v. Jacob Jordan*, 20-cr-55 (TFH) (D.D.C.

March 23, 2020) (acknowledging the risks associated with COVID but denying release in a guns and drugs case with no prior convictions); *United States v. Gonzalez*, 20-cr-40 (BAH) (D.D.C. March 24, 2020) (denying release, noting the steps taken by DOC to protect inmates); *Lee*, 19-cr-298 (KBJ) (denying release in a firearms case based on generalized COVID-19 concerns); *United States v. Parker*, 19-cr-349 (APM) (D.D.C. March 30, 2020) (denying release after a 924(c) plea despite Eighth Amendment claim); *United States v. Watkins*, 20-cr-19 (CRC) (D.D.C. March 31, 2020) (Minute Order) (highlighting the §3142 factors and noting that a "generalized risk to otherwise healthy detainees" is not alone sufficient, denying release in a gun case); *United States v. Foster*, 17-cr-160 (RC) (D.D.C. March 31, 2020) (Minute Order) (discussing *Lee* and other relevant authorities but denying release in a postal robbery); *United States v. Lin*, 19-cr-387, at *4-5 (TJK) (D.D.C. April 1, 2020) (denying release in an aggravated identity theft conspiracy and noting that "even a heightened risk of infection is but one factor that the Court must balance" and finding the difference between COVID-19 pandemic at Rikers Island and D.C. jail to be "substantial"); *United States v. Marchi*, 19-cr-406 (DLF) (D.D.C. April 2, 2020 Minute Order) ("[B]ased on the current record, neither the present pandemic nor the defendant's mild asthma is a new circumstance that warrants reconsideration" in a firearm case); *United States v. Mathis*, 19-cr-330 (CJN) (D.D.C. April 2, 2020) (denying release post-plea in a an obscene materials to a minor case despite possible existence of hypertension); *United States v. Whitaker*, 19-cr-351 (DLF) (D.D.C. April 2, 2020) (denying release pending sentencing in a firearms case even though the defendant claimed bronchitis, allergies, and asthma); *United States v. Bailey*, 19-cr-391 (JDB) (denying pretrial release in a child pornography case, despite defendant's claim of "complicated medical conditions," noting the applicable §3142 factors); *United States v. Amos*, 19-cr-398 (CRC)

15

(D.D.C. April 3, 2020) (denying release in a firearms case after a plea); *United States v. Park*, 16-cr-9 (TSC) (D.D.C. April 4, 2020) (denying pretrial release in a sex offense case where the defendant failed to rebut the presumption and failed to offer a plan in place if released); *United States v. Brooks*, 19-cr-67 (RCL) (D.D.C. April 4, 2020) (denying release after a plea to a firearms charge when the defendant failed to specify the nature of his asthma); *United States v. Green*, 19-cr-250 (DLF) (D.D.C. April 6, 2020) (denying post-plea release in a gun case where the defendant failed to meet 3143(a)(1) factors, and his health risk was limited); *United States v. Carter*, 19-cr-39 (RBW) (D.D.C. April 7, 2020) (denying pretrial release in a Hobbs Act robbery case where DOC is trying to take steps to protect inmates and weighing the 3142(g) factors, including the defendant's criminal history and the "very weighty" evidence); *United States v. Iverson*, 19-cr-388 (TJK) (D.D.C. April 10, 2020) (denying release after a plea to distribution of child pornography); *But see United States v. Harris*, 19-cr-356 (RDM) (D.D.C. March 26, 2020) (releasing defendant in a child exploitation case in part because of COVID-19 pandemic, along with the expert opinion signifying the defendant's limited danger); *United States v. Jaffee*, 19-cr-88 (RDM) (D.D.C. March 26, 2020) (releasing defendant because of COVID-19 pandemic but noting his prior perfect compliance with his conditions of release as well as weakened state evidence in a gun and drugs case); *United States v. Mclean*, 19-cr-380 (RDM) (D.D.C. March 28, 2020) (releasing the defendant in a gun and drugs case due to COVID-19, the defendant's prior HISP release orders, and the underlying condition for diabetes); *United States v. Johnson*, 19-cr-52 (TSC) (D.D.C. April 8, 2020) (granting pretrial release in a felon in possession case where defendant had documented medical issues, including obesity, mobility issues, digestive disorders, and the fact his two prior

trials were postponed due to such documented issues) A close reading of each case suggests that the particulars of the defendant's circumstances and case guide the analysis.

The invocation of the pandemic alone does not cause the defendant's release even under 18 U.S.C. § 3142(i).[8] *See United States v. Phillips*, 20-cr-36, at *2 (ABJ) (D.D.C. April 10, 2020) ("[T]he defendant has focused almost exclusively on the virus, without addressing the facts that relate to him specifically, and following his argument to its logical conclusion would mean that the courts are now obliged to open the doors and release every person at the jail who is awaiting trial. That cannot be the right answer, and judges all over the country have emphasized that these decisions must be made on a case by case basis.").

Opinions filed in neighboring districts are in accord.[9] On March 17, 2020, Judge Paul Grimm of the U.S. District Court, Maryland, issued a written memorandum opinion on this very issue. *United States v. Martin*, 2020 WL 1274857, *2 (D. Md. March 17, 2020). Noting, appropriately, that the Court "takes this [COVID-19] health risk extremely seriously," the Court

---

[8] *See also United States v. Cox*, No. 19-cr-271, 2020 WL 1491180 (D. Nev. Mar. 27, 2020); *United States v. Green*, No. 19-cr-304, 2020 WL 1477679 (M.D. Fla. Mar. 26, 2020); *United States v. Steward*, No. 20-cr-52, 2020 WL 1468005 (S.D.N.Y. Mar. 26, 2020); *United States v. Hamilton*, No. 19-cr-54, 2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020).

[9] *But see United States v. Stephens*, 15-cr-95-AJN (S.D.N.Y. March 19, 2020) (COVID-19 outbreak and as well as a change in the facts of the case – a possible misidentification by an eyewitness – necessitated release). In choosing to release the defendant, the Court noted the defendant's lack of a violent record, the weakened state of the government's evidence, the failure of the local jail to arrange legal calls in preparation of his defense, and the effective ban on legal visits with limited exceptions as bases to implement release conditions. *Id.*

Notably, the Court recognized that its decision cannot be made simply because of COVID-19. *See id.* at *6 n.3 ("The Court need not decide this additional factor [the current public health crisis] here because its determination that release is necessary for the preparation of the Defendant's defense is sufficient under § 3142(i).")

nevertheless recognized that "resolving . . . an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act." *Id.* at *3. In addressing the new issue raised by the defendant – COVID-19 – the Court nevertheless found that the defendant's health (his asthma, high blood pressure, and diabetes) was "insufficient to rebut the proffer by the Government that the correctional and medical staff at [the local detention facility] are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus." *Id.* at *4. Finally, the Court questioned the defendant's proposed use of GPS location monitoring even if the defendant was released subject to conditions, finding that such monitoring "is not a limitless resource, nor its installation and monitoring by United States Pretrial Services officers without risk to those personnel . . . given the current recommendations regarding implementation of social distancing." *Id.*; *see also United States v. Lewis*, 19-cr-34-LMA-MBN (E.D. La. March 19, 2020) ("If anything, the COVID-19 pandemic has reduced the availability of conditions to mitigate the risk to the community").

In fact, the District of Maryland, Greenbelt Division – whose defendants are also detained by DOC – has almost uniformly denied such petitions on similar, generalized grounds. *See, e.g.*, *United States v. Bilbrough, IV*, 20-cr-33, at *4-5, 7 (TDC) (D. Md March 20, 2020) ("D.C. Department of Corrections appears to be taking reasonable steps to prevent and combat the spread of COVID-19 in its facilities. Although [the defendant] may still be at an increased health risk [from diabetes] . . . this factor alone does not outweigh the other factors."); *United States v. Brown*, 16-cr-553 (RDB) (D. Md March 26, 2020) (denial of release from BOP custody); *United States v. Jefferson*, 19-cr-487 (CCB) (D. Md March 23, 2020) ("Precautionary measures have been implemented at CTF in light of the COVID-19 pandemic" denying release to an asthmatic

defendant); *United States v. Johnson*, 17-po-9262 (TMD) (D. Md March 20, 2020) (discussing general risk of exposure to COVID-19, but denial of release on other grounds); *United States v. Jones*, 17-cr-582, at *2 (CCB) (D. Md March 20, 2020) ("CDF medical personnel are adequately addressing Defendant's medical needs" and the COVID-19 "risks are not the sole determinant of whether detention is appropriate."); *United States v. Legard*, 19-cr-137, at *2-3 (PWG) (D. Md March 24, 2020) (Asthma was not a basis alone to release a defendant in light of COVID-19 pandemic and that the measures at the D.C. jail are "in compliance with state and federal guidelines regarding protective measures"); *United States v. Perry*, 14-cr-181, at *1-2 (GLR) (D. Md March 26, 2020) (denial of release from halfway house due to COVID-19, but on statutory reasons, but also noting that the affidavit of Dr. Marc Stern "lack[ed] the case or institution specificity to determine, with sufficient certainty, the health risks posed at the institution."). In fact, in *United States v. Williams*, 13-cr-544 (PWG) (D. Md March 23, 2020), the Court even acknowledged that DOC has taken significant measures to stem the tide of the pandemic, but that "[s]hould the unfortunate event occur, the correctional authorities have in place a plan of action that should not be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon [the defendant] directly." *Id.* at *5. Perhaps most explicitly, "[t]he existence of the present pandemic, without more, is not tantamount to a "get out of jail free" card. Not even for the older person being detained." *Id.* The Court thus denied a 67-year-old defendant emergency release.

The government appreciates the gravity of this global pandemic and is committed to ensuring the safety and health of inmates like the defendant.[10] And should circumstances change

---

[10] In fact, as this Court may be well aware, the government has meaningfully endeavored – on a

at the DOC, to the point that the defendant's health is actually in jeopardy, the defendant may request reconsideration. But at this stage and at this time, based on the information provided by DOC, DOC appears dedicated and willing to address this public health crisis.[11]  Given that, as well as the facts of this case, which demonstrate the Defendant presents a clear danger to the community that (due to the electronic based nature of the offense) would not be mitigated by home confinement, the Defendant should continue to be held pending trial.

### III.    The Defendant's Incarceration in this Case Does Not Constitute a Violation of the Fifth or Eight Amendment.

The Defendant's continued confinement does not constitute a Fifth or Eight Amendment violation. Judge Grimm of the United States District Court for the District of Maryland considered this issue, briefly, in *Martin*, before holding that "as concerning as the COVID-19 pandemic is, resolving an appeal of an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act." ___ F.3d at ___, 2020 WL 1274857 at **2-3 (citing *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001); *Loe v. Armistead*, 582 F.2d 1291, 1293–94 (4th Cir. 1978)). As the Supreme Court has long held, "[n]ot

---

case-by-case basis – to permit temporary release pursuant to 18 U.S.C. § 3142(i) to those who actually need release. This includes non-violent offenders who have verified serious health risk and are otherwise vulnerable. The pandemic, however scary, does not change the circumstances that led the government and the court to previously conclude that the offender represented a serious risk to the community. The government will continue to work with the defense bar to address those with health concerns.

[11] The U.S. Attorney's Office continues consulting with the DOC on a frequent basis in light of the rapidly-changing situation.

every disability imposed during pretrial detention amounts to 'punishment' in the constitutional

sense." *Bell*, 441 U.S. at 537.

The Courts of Appeal have been even more explicit:

[I]solated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate. Nor can the incidence of diseases or infections, standing alone, imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks. . . *a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights.*

*Shepherd v. Dallas County*, 591 F.3d 445, 454 (5th Cir. 2009) (emphasis added); *see also*

*Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (noting that a pretrial detainee could not make

out a Due Process claim without showing that the detention facility demonstrated "deliberate

indifference" or "recklessness" with regard to inmate safety) (citing *Farmer v. Brennan*, 511 U.S.

825, 836-37 (1994)).

The Defendant could not satisfy this burden. Far from being deliberately indifferent to the

threat of COVID-19, DOC has enacted its own protocol – a protocol that is complaint with CDC

and D.C. Department of Health requirements and recommendations. DOC has implemented its

protocol to quarantine inmates who might have been exposed to COVID-19, and also to isolate the

inmates who have tested positive. *See also Lee*, 19-cr-298, at *10-11 (finding that prison

authorities have not been deliberately indifferent to this threat); *Parker*, 19-cr-349, at *2 (noting

that the defendant offers "no proof specific to [DOC] efforts to manage the present crisis to support

his constitutional claim."); *United States v. Thorne*, 18-cr-389, at *5 (BAH) (D.D.C. March 31,

2020) ("[D]efendant has not shown that the DOC is deliberately indifferent" to risks and that DOC

protocols "undercut any claim of" deliberate indifference).

In the absence of a Due Process violation, the Court must rest its decision on the applicable Bail Reform Act factors, which, as noted above, continue to weigh heavily in favor of pretrial detention in this case. Notwithstanding the risk of COVID-19 to prisoners, and any increased risk of negative outcomes to him if he got it due to his (unspecified and unverified) health conditions, the Defendant cannot rebut the presumption of his dangerousness, and there is thus no combination of conditions which would ensure the safety of the community if he is released.

**WHEREFORE**, for the foregoing reasons and for any other such reasons as may appear to the Court, the government respectfully requests that the Court deny the defense motion for release into home confinement.

Respectfully submitted,
TIMOTHY J. SHEA
United States Attorney
D.C. Bar No. 437437


By: _____/s/_____
NICHOLAS MIRANDA
Assistant United States Attorney
D.C. Bar No. 995769
555 4th Street, N.W.,
Washington, D.C. 20530
202-252-7011
Nicholas.Miranda@usdoj.gov

Dated: **April 12, 2020**